Good morning, your honors. May it please the court, I'm Deputy Attorney General Kim Ahrens, appearing on behalf of the appellant and respondent in this case, and I'd like to reserve one minute for rebuttal. This appeal was brought because the district court erred in setting aside the state court judgment below by misapplying the standard of review in federal habeas corpus matters under the AEDPA or AEDPA. Under AEDPA, the only authority that is relevant is controlling Supreme Court authority, and the only controlling Supreme Court authority addressing parole suitability decisions is the Greenholz decision. Mr. Clay received all of the due process required under Greenholz, which is an opportunity to be heard and a statement of reasons of how he fell short of suitability for parole. Yeah, and I think you probably had a governor here that never granted parole to anyone during his eight years. Well, the issue of former Governor Davis's — Isn't that true? The Rosencrantz decision in the California Supreme Court rejected that contention, and that contention was not raised in the district court below. Rejected what contention? That the governor did not grant parole, that he routinely had a policy of failing to grant parole. That was rejected by the Rosencrantz court, and that issue was not raised below. I know, but I'm just making an observation. He did grant parole, and there's no requirement that the governor grant parole in every case, and federal due process is the threshold level of process due. It is the minimum under national standards, and the governor's decision met those standards under Greenholz. In addition, the district court erred in using the sum evidence standard of review. Greenholz expressly rejected that standard of review. The Greenholz decision analyzed the Wolf decision, which discussed revocation of good time credits and disciplinary proceedings. That's the same issue in Superintendent V. Hill. The Greenholz decision said, and I quote, nothing in due process requires the parole authority to specify the particular evidence in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for release. Are you concerned, counsel, that if the offensive commitment is always relevant and sufficient in and of itself, that in the eyes of any particular governor, a life sentence with a minimum term becomes a life sentence without possibility of parole in effect? Well, a life sentence is a life sentence, and that becomes an Eighth Amendment claim. And the Supreme Court has consistently upheld life sentences for offenses less than first-degree murder. But if the panel believes, as the court in Hayward did, that there is a liberty interest in parole and believes that the sum evidence test, as used in Hill, is the test that we should look to, ruling that the offensive commitment as a standing-alone proposition is forever and ever, amen, sufficient to convert it to a life sentence without possibility of parole, isn't that a violation of due process? Not under the AEDPA standard, it's not, because there's no controlling Supreme Court authority. Even if this court, in its independent judgment, felt that it was a due process violation, this court has recognized in Crater v. Galazza that there is an additional restriction under the AEDPA. And when the Supreme Court has not spoken to the issue, then this court is restrained. It would be a different issue if the claim was raised outside of the habeas corpus statute. For example, if the inmate went directly to the Supreme Court from the California Supreme Court, that would not be a habeas corpus matter. But because of that constraint, especially in light of Moose Laden and the more recent Landrigan decision, the Supreme Court has been very clear that Supreme Court authority must be very specific. And obviously it's our position that the sum evidence standard should not apply. But even if it did apply, this is not a case like Hayward where the governor relied solely on the crime. The governor relied on several factors that were all related to each other. The thing I'm wrestling with, though, is that I didn't, I didn't, I agreed with the prisoner's argument regarding the other reasons. I mean, what I'm struggling with really, I mean, is the notion that the offense itself may meet the test of creating an unreasonable risk of harm to the community. And, I mean, if I were on the board or I were the governor, I think I'd let this person out. That's my, that would, might be my judgment. But I'm really struggling with the notion that there's no evidence and that the, that the offensive commitment doesn't constitute some evidence that supports the governor's decision. After all, he or she is the one who was given that. Right. Decision to make. Well, that's, that test of the current risk to public safety is a state law test. It's not a federal due process requirement. And under the California Constitution, the governor has that discretion to have the final check on board decisions. And this is not a case like Hayward. Hayward had some mitigating circumstances. The court expressed that there was an element of provocation in the Hayward case. Hayward had suitable plans for parole. He had several job offers where he intended to live. He didn't have a history of theft-related offenses where his murder was also related to a robbery like this case. And the governor's concern in this case is this inmate has a long history of theft-related crimes. The first degree murder was committed for the purpose of robbery. At the time of his sentencing, the probation report noted he had been unable to hold a job and his financial situation was poor. He was counseled eight times for failing to report to work after he was incarcerated. In addition to that, he received four serious rules violations reports for failing to report to work. So now he's up for parole after being incarcerated for this long time, and his parole plans are not, as the governor said, realistic because he is expecting to go to a job in San Diego and live in Los Angeles. And this is an individual who's already had a difficult time. He also thought he would get a job with Goodwill Industries. He did think he could get a job, but when inmates are paroled as part of their conditions of parole, they're expected to find work and to be able to provide some means of support, and there was discussion of that in the record. And so maybe the governor felt that maybe there is some evidence. It's just a modicum of evidence. And the inmate's position that he might have a position is not realistic, and I'd like to reserve the remaining time for rebuttal unless the Court has any questions. Well, do you agree that under Ninth Circuit law that an inmate has a liberty interest in parole? Under Ninth Circuit authority, it's not clearly established. Supreme Court authority and that issue is pending. I just asked you one question. You've got to answer that yes or no. Yes. Under Ninth Circuit authority, yes. The answer is yes. Okay. All right. Let's move to the next slide. Thank you. Good morning, Your Honors, and may it please the Court. I'm Elizabeth Newman representing Mr. Clay. And before I begin, I would like to thank the Court for moving oral argument to accommodate me. And I do realize what an inconvenience this has caused particularly to Judge Archer, and I do want to give my ---- Judge Layton. I'm sorry, Judge Layton. My appreciation. I'm sorry. Can I just ask, what is the custodial status of Mr. Clay right now? Mr. Clay is currently in custody. He remains in custody as he has been since 1976. And have there been any other parole hearings since the date of the last one and the recommendation that he be granted parole? There have not, Your Honor. He has chosen to defer parole consideration until this litigation has concluded. Okay. And, of course, we hope that no further parole consideration by the Board of Prison terms or the new body will be necessary. Well, counsel, the State is arguing that there's no currently established Federal law that would require application of the sum evidence standard. But aren't we bound by that because prior Ninth Circuit cases have held that? Yes, I believe that that's certainly the case, Your Honor. Hayward is only the most recent to recognize that clearly established Supreme Court law is represented by the sum evidence test in this particular case. Speak up just a little bit, please. Oh, I'm sorry, Your Honor. Yes, this Court's precedent, and particularly most recently Hayward, do establish that the sum evidence test is the test that is clearly established Supreme Court law that is to be applied to Mr. Clay's appeal. Counsel, are we on the verge of creating a bright-line test here if back-to-back, in successive months, we have Hayward, and if we rule in your favor, aren't we sending a message that the offensive commitment loses relevance at the time of the minimum sentence that's been served? No, Your Honor, I don't think so at all. I don't think that there is really any bright-line test in any of these cases. This is a case of discretion. The view of the case, the Court's assessment, like the Board's and the Governor's later, has to be holistic, somewhat impressionistic. And although the Court in Hayward didn't set forth any clear analytic framework to what it did, I think that from what it did, an analytic framework can be understood, which is that once the minimum term has been served, which was seven years in this case, bringing us to 1983, at that point, the conviction offense or the commitment offense itself can no longer bright-line serve as a proxy for continued unreasonable dangerousness if the inmate is released. At that point, there has to be some showing of a nexus between that commitment offense or other aggravating factors and a conclusion on the part of the Board or the Governor, as circumstances may dictate, that the inmate currently presents an unreasonable danger if he is released. How does a Governor or how does a Board do that if you've got an offense, and assuming as we have in a number of cases, including this one, you've got an inmate who is a model citizen in a highly structured and controlled environment? How does a Governor then say, this offense is so heinous that that? And I don't know what prose the Governor puts in that says, I think that 30 years later he is or she is, most likely he is, still presents an unreasonable risk to the community. You mean what would the Governor have had to say in this case or some other case? Or some other case. Right. I thought about that a lot in preparing for argument, Your Honor, and this is the best I, or this is what I came up with. I think that there are really two basic answers to the Court's question. One is that the Governor needs to be able to point to facts in the record that show that the commitment offense still represents something live in the inmate. For example, there's a recent state court case. It's not cited anywhere in the briefing because this is the only point that I would point the Court to it for, and that's Bettencourt. It was decided after the conclusion of principal briefing in this case. And in that case, parole consideration was denied. The inmate appealed. It's up on state habeas in the Intermediate Appellate Court in California. And parole denial was upheld. And one of the reasons was that it seemed clear from the prisoner's behavior in prison that he still could not completely control his impulses. For example, even during his parole board hearing, he had engaged in a verbal outburst that caused him to be removed from the hearing room. And that's not a crime. That's maybe not even a subject for a counseling chrono. I really don't know. But that is some suggestion that this man's offense, which I think was a second-degree murder, maybe a first-degree, I really can't remember, and I'm sorry about that, that that lack of impulse control was something that was still live in him, so that there would be something in what the inmate has done and is still doing that shows that what he did that got him there is still something he's still conceivably engaged in. And absent that, a model citizen in a highly structured environment, the offense of commitment after service of minimum term fades to black. No. What it fades to is no longer a proxy for you can't get out, no longer a bright-line proxy for you can't get out. I would argue that actually the situation given the circuit's case law in Sass, Biggs, and Irons is actually the contrary, that the inmate's prospects fade to black until the completion of the minimum term. That seems to be what the circuit's case law says if you look at it sort of globally. But after that point, it starts getting more gray until at some point the colors are nice enough that the inmate is considered not unreasonably dangerous. And the second part of my answer to the court would be that it seems that in Hayward, although again it's not explicitly stated, that the court was sort of going on two axes, one being the commitment offense and its predictive value waning over time, and the other being the rehabilitative factors which gain strength and persuasive power over time. So as the commitment offense or as the predictive value of the commitment offense wanes, the predictive value of the model citizen stuff waxes. I should have brushed up on my geometry before I came here. But how do you factor in, for example, Kunkler and Culverson that are admittedly mem dispos, but they're cases where panels of the Ninth Circuit looked at the case where they have served more than their minimum and they were model citizens and they said there was some evidence by the offense alone to support a governor or a board's decision not to grant? Well, I think that, first of all, given that they're mem disposed, the factual summary is sketchy, understandably so. And the analysis is perhaps not as thorough or detailed as one would find in a published opinion. What are the ñ what were the offenses in those two cases? In those two cases? Culverson was ñ Culverson, oh, dear. It was homicide. Yes. I'm sorry, Your Honor, my notes don't reflect that, and I apologize if the Court would like that. I just know that I was on a panel where we prepared a mem dispo, and we found the circumstances of the offense particularly heinous and that the criminal defendant did not yet still appreciate just how heinous it was, and that was the person who kidnapped the kids in Chula Vista and buried them. Yes, that's right. And that's the one that I have in mind where the ñ when you're waxing and waning analogy, I mean, it was a combination of that that was a particularly heinous crime, to bury all these school kids, and the impact was really great, and the inmate not appreciating it or being fully appreciative of the impact of his crime on the world. But it was a combination. It wasn't just ñ Yes, again, and in addition, Your Honor, what I gleaned from the decisions was that it might be ñ it might have been, judging by the opinion in those cases, or the mem dispo in those cases, that the prisoners or petitioners in those cases had argued that there was a bright line, that there absolutely is a limit to the number of times that a commitment offense can justify continued denial of parole. And that's certainly not what we're arguing here, and I don't think that the court's case law would support such an argument. But what I gleaned to answer the court's question from Culverson and Kunckler was that there had been possibly an argument given in the briefing, that the way that the issue was framed was that there now was such a bright line. And I don't think that that's the case. I don't think the court's case law would support such a statement. The other thing that I wanted to bring to the court's attention was in looking at Hayward once again and its command that the record has to be viewed fairly and in context, I was looking at the number of times that the governor was factually wrong in our case. And I know I've pointed them out to the court in my briefing, but there was some new aspect of it that I did want to bring to the court's attention. In wondering or trying to figure out how the governor got somewhat confused in this, I thought that perhaps, although even this doesn't completely account for it, that perhaps the governor was looking at my client's arrest record, and certainly he has arrests for things he wasn't convicted of. And so I wanted to bring to the court's attention California Code of Regulations, the parole regulation, Section 2326, which says that arrests don't count, that they cannot form a part of a parole consideration unless the facts are verifiable and are integral to the commitment offense, which these would not be. So I did want to bring that to the court's attention. And the final thing, if the court will indulge me for as fast as I can talk, is that as to whether this really was an egregious offense, Mr. Clay certainly has accepted responsibility for it long since. All his psych reports show that, and there's no indication that these trained people concluded that he was lying in any way. But also it's really unclear, and as the court could probably see from my briefing, it's really unclear about whether this was egregious under the factors in the parole regulation. For example, the Board of Prison Terms commissioner who wanted to deny him, so who had every reason to list every aggravating factor, didn't say anything that would show that this was egregious within the meaning of the regulation. The governor talks about how the victim, Mr. Jerem Rosich, was placed in the car still alive. The board member who wanted to deny Mr. Clay didn't say anything about that. He didn't say anything. I'm sorry, Your Honor? We have all of it. Okay. Yeah, there's all the letters in the record on that. Thank you. As well as a few other things that the governor says. Yes. Thank you, Your Honor. Unless there are any questions? No? Thank you, Your Honor. We'll have some rebuttal. Yes, just very briefly, Your Honors. I'd like to address the Code of Regulations, Section 2326, about consideration of criminal charges not resulting in conviction. That section applies to the setting of a base term of confinement after parole has been granted. It doesn't apply to what may be considered during the parole suitability process. The board may consider aggravating circumstances when it sets a base term of confinement at the same time that it finds an inmate suitable for parole. Furthermore, Section 2281 of the regulation says that the board or the governor may consider all relevant, reliable information. I'd also like to state that the Hayward case is a petition for rehearing and rehearing en banc is pending and no formal mandate in that case has been issued. With regard to concerns about a risk of current risk to public safety, the California regulations provide the factors for determining whether an inmate poses a current risk to public safety. That's what the regulations are about. And in addition, Penal Code Section 3041 provides the factors. But specifically, California Code of Regulations, Section 2281, says these are the factors that the decision maker must look at. So I would submit that when the governor or the parole considers these factors under California law, then the public safety determination is inherent in these factors. And there are several cases pending before the California Supreme Court right now, which I noted in my supplemental briefing on Hayward, because some California courts of appeal are disagreeing about how many factors are enough. Is one factor enough? Is the crime enough? And hopefully the California Supreme Court will resolve the issue. Can I ask you, are you resting your position entirely on the there's no clearly established Supreme Court law prong of the AEDPA standard? Yes, and I wanted to bring the Court's attention to the Duhame v. Ducharme case. It's a Ninth Circuit case in which this Court found that district courts are not bound by Ninth Circuit precedent under the AEDPA. The district court can rely solely on Supreme Court authority, even when there's Ninth Circuit authority to the contrary. And that case So you're ignoring the unreasonable application prong of AEDPA? Well, it would be an unreasonable application only under the Greenhalgh's decision. Right, well, if the governor cites facts to support his decision, which aren't supported in the record, wouldn't that be an unreasonable application? No, it wouldn't, because the Supreme Court was very careful in Greenhalgh's to compare parole suitability cases and the liberty interest in those cases as compared to, for example, in the Hill case, where it's a disciplinary proceeding. That's a higher liberty interest. So in parole determinations, the inmate only has a hope of being released on parole. And Greenhalgh said that the Constitution does not require more because it's a uniquely state interest in granting inmates parole. The state creates the system. The state could take away the system if it wanted to. And it's a discretionary determination. So the Supreme Court said due process does not require more than an opportunity to be heard and then a statement of reasons for the decision. Now, that statement doesn't have to be based on evidence under Greenhalgh's. The statement is merely to inform the prisoner. So it can be a totally arbitrary statement? Greenhalgh says that these are the minimum requirements under due process to prevent arbitrary decisions. That's what Greenhalgh says. And it says there are, and I quote, on page 10 of the Greenhalgh's decision, no set of facts which, if shown, mandate a decision favorable to the prisoner. There's no prescribed or defined combination of facts which, if shown, would mandate release on parole. So the Supreme Court has said because this is a forward-looking process, in contrast to revocation proceedings where you're looking back and there's some fact-finding about what happened in the past, parole suitability is forward-looking and it's a prediction about what the inmate might do. So there's no hard and fast rule. There's no perfect formula for making that determination. It's partly based on facts and partly based on the subjective determination of the board or the governor in this case. All right. Thank you, Your Honor. Thank you. If I believe each of you has, if you've referred to cases that are not cited in your briefs, we might fill out one of our gum sheets. All right. So we're going to recess and move back and get a reconstituted panel. All rise. This court stands at a short recess.
judges: Pregerson, Wardlaw, Leighton